[11.2011 2703c warrant]

**MISC.** ⌐ ⌐ -006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO TWO SPECIFIED
WIRELESS TELEPHONES

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

**FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION**
(Fed. R. Crim. P. 41; T. 18,
U.S.C., §§ 2703(c)(1)(A),
3103a and 3117; T. 28,
U.S.C., § 1651(a))

I, Richard M. DeLisio, being first duly sworn, hereby depose and state as follows:

1.   I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for (1) information about the location of the cellular telephone assigned call number (917) 224-8087, subscribed to JOHN DOE, 555 WATER STREET, BROOKLYN, NEW YORK 11235 ("SUBJECT TELEPHONE 1") whose wireless telephone service provider is AT&T ("the Service Provider"); and (2) information about the location of the cellular telephone assigned call number (917) 370-6944, subscribed to PETER LIOUNIS, 59 GENESEE AVENUE, STATEN ISLAND, NY 10308 ("SUBJECT TELEPHONE 2") (together with SUBJECT TELEPHONE 1, "the SUBJECT TELEPHONES") whose wireless telephone service provider is the Service Provider.  The SUBJECT TELEPHONES are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.   I have been a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") for approximately three years and am currently assigned to the New York division, where I am tasked with investigating mail fraud, wire fraud, money laundering and other offenses.  As such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  Among other duties, I am participating in an investigation relating to mail fraud, wire fraud and money laundering by PETER LIOUNIS, also known as "Mark Anderson," FNU LNU also known as "Sam Freed," IRYNA YAROVA, JOHN GIARDINA, and others known and unknown (the "SUBJECT INDIVIDUALS" or "SUBJECTS").

3.   During my tenure with the HSI, I have participated in numerous white collar fraud investigations; and have participated in all aspects of investigations, including conducting surveillance, debriefing defendants and informants, interviewing witnesses, analyzing information obtained from court-ordered wiretaps, location tracking devices, pen register/trap and trace intercepts and analyzing telephone toll information.  During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons

2

involved in mail fraud, wire fraud and money laundering.   I am aware that white-collar criminals commonly use cellular telephones in furtherance of their criminal activities and may frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that such criminals often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection.

4.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.   Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.   In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

5.   Based on the facts set forth in this affidavit, there is probable cause to believe that mail fraud, wire fraud and money laundering, in violation of 18 U.S.C. §§ 1341, 1343 and 1956 ("the SUBJECT OFFENSES") have been committed, and are being committed, by the SUBJECT INDIVIDUALS.   There is also probable cause to believe that FNU LNU also known as "Sam Freed" has used and is currently using SUBJECT TELEPHONE 1 to commit the SUBJECT OFFENSES; and PETER LIOUNIS, also known as "Mark Anderson," has

3

used and is currently using SUBJECT TELEPHONE 2 to commit the SUBJECT OFFENSES. There is therefore probable cause to believe that the location information, including but not limited to E-911 Phase II data (or other precise location information) concerning the SUBJECT TELEPHONES (the "REQUESTED INFORMATION"),[1] as described in Attachment B, will constitute evidence of these criminal violations, and will lead to will lead to additional evidence of the SUBJECT OFFENSES and the identification of individuals who are engaged in the commission of the SUBJECT OFFENSES.

## PROBABLE CAUSE

I.   The Rockford Group Scheme

6.    From approximately March 2009 until at least November 2009, Rockford Group marketed itself to investors through its web site, rockfordgroupllc.com ("the Rockford Web Site") and through unsolicited telephone calls to potential investors. On the Rockford Web Site and in telephone calls to investors, Rockford Group touted the investment value of the "Fixed Dividend Contract"

---

[1]   Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONES at the start and end of any call or text message transmission. In requesting cell site information, the government does not concede that such cell site records — routinely retained by wireless carriers as business records — may only be obtained via a warrant issued on probable cause. See In re Application, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.); In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

in which Rockford Group purchased plaintiffs' rights to future recoveries in personal injury and other lawsuits.

7.    Under the "About Us" heading on the Rockford Web Site, Rockford Group described itself as "[a] leading private equity firm equipped with an $800 million dollar pipeline of investments, designed to provide opportunities for income, capital appreciation and preservation." Under the heading "Management" on the Web Site were names and accompanying photographs of sixteen men and four women, including "James Weston," who was described as "VP Private Client Services."

8.    In or about July 2009 the Securities and Exchange Commission ("the SEC") began an investigation into Rockford Group after receiving information from the Securities Investor Protection Corporation ("SIPC") that Rockford Group was falsely claiming to be a member of SIPC and falsely claiming that its investors were protected by SIPC insurance. As part of this investigation, the SEC obtained Rockford sales literature, bank account records and other documents, and interviewed numerous Rockford investors. These investors, who were located throughout the United States during the relevant time period, informed the SEC that beginning in or about March 2009, they began receiving unsolicited phone calls from representatives of Rockford Group.[2]    The representatives

---

[2] In or about November 2009, the SEC contacted law enforcement authorities concerning the Rockford investigation, and the Postal Inspection Service, working with the United States Attorney's

5

solicited investments in Fixed Dividend Contracts, and claimed that
Rockford Group had special experience and expertise in this area of
investment.  The representatives also promised investors that they
would earn a fixed rate of return of 15% on investments with
Rockford Group.  The representatives further told investors that
they could earn higher guaranteed rates of return if they invested
larger amounts of money.

9.   On or about June 30, 2009, Rockford Group mailed a
media release ("the Media Release") to existing Rockford Group
clients, several of whom provided copies of the Media Release to
law enforcement authorities.  The Media Release contained numerous
false statements.   For example, the Media Release falsely
identified twenty large, well-known corporations as Rockford
Group's "major institutional pension plan clients."
Representatives of nineteen of these twenty corporations have
informed the SEC and/or law enforcement authorities that their
companies have never had a relationship with Rockford Group.[3]

10.   The Media Release also falsely claimed that since
1999, Rockford Group's cumulative annual rate of return through
June 30, 2009 was 251%, outperforming the Dow Jones Index by 238%.
As noted above, however, Rockford Group did not exist until

---

Office for the Eastern District of New York, opened an
investigation.

[3]The twentieth company did not respond to law enforcement
inquiries.

December 22, 2008, and neither the SEC nor law enforcement authorities have found any evidence to suggest that Rockford Group engaged in any investment activity that would generate returns for investors, much less its claimed returns.

11. During the period March 23, 2009 to April 21, 2009, the Rockford Web Site represented that Rockford Group was a member of SIPC and that its investors were protected by SIPC insurance. Rockford Group made the same false representation in a sales brochure ("the Sales Brochure") it distributed to prospective and existing Rockford Group investors by mail.

12. SIPC has confirmed that investments with Rockford Group have never been insured by SIPC and that Rockford Group has never been a member of or in any way affiliated with SIPC.

13. The Rockford Web Site provided a toll-free number ("the Rockford 800 Number") for investors to contact Rockford Group. The Rockford 800 Number was maintained by Voice Nation LLC ("Voice Nation"), a telephone service that provides an 800-number which can be routed to a user's telephone. Voice Nation also provides a "live answering" service in which employees of Voice Nation answer the 800-number and provide pre-arranged information to outside callers. This service is designed in part to create the impression that the Voice Nation employees work exclusively for the company paying for the "live answering" service.

7

14. Based on these and other false representations, Rockford Group solicited over $11 million from at least 200 investors in the United States and Canada. No evidence suggests that Rockford Group used investor funds as it promised its investors it would. Instead, Rockford wired nearly all of the investor funds to bank accounts overseas.

15. According to bank records, investors with Rockford Group often received a relatively small portion of their investment as dividend payments in the months following their initial investment. These payments stopped altogether, however, by November 2009, and none of the investors have received any payments from Rockford Group since then. Although a few investors successfully withdrew all of their funds prior to November 2009, the overwhelming majority of investors lost all of their principal investment, and have had no contact with anyone purporting to be from Rockford Group since November 2009.

16. On December 8, 2009, the SEC obtained an order ("the SEC Order") from the Southern District of New York, in which the Court froze all assets that Rockford held in the United States, based on allegations that Rockford had engaged in the fraud described above. Shortly after the SEC Order was entered, Rockford Group abandoned its office space and shut down its telephone service.

II.   The UBS Scheme

8

17.   Several of the Rockford investors interviewed by the SEC informed the SEC that they invested funds in Rockford in 2009 after receiving numerous telephone calls from a person purporting to be "James Weston," a representative of Rockford.

18.   In or about June 2010, one such investor ("Investor #1") contacted the SEC after learning of the SEC Order.   In or about July 2010, Investor #1's daughter contacted the SEC again and informed the SEC that Investor #1 had received a telephone call from a person who identified himself as "Santo Crivera" and attempted to solicit Investor #1 to invest in a laundromat business.   Shortly after Investor #1's daughter contacted the SEC, law enforcement authorities interviewed Investor #1 by telephone. In this interview, Investor #1 informed law enforcement agents that Investor #1 recognized the voice of the person purporting to be "Santo Crivera" as the voice of "James Weston" with whom Investor #1 had dealt in connection with Investor #1's investments with Rockford Group.   Investor #1 recognized this voice because the person Investor #1 knew as "James Weston" has a distinctive, high-pitched voice.

19.   Investor #1 contacted law enforcement authorities after he received this telephone call from "Santo Crivera."   A law enforcement agent instructed Investor #1 to record all future telephone calls from the person purporting to be "Santo Crivera."

9

20.    Thereafter, Investor #1 recorded several calls from "Santo Crivera" beginning in July 2010.  In these recordings, the person purporting to be "Santo Crivera" stated that he lived in Staten Island, New York and had triplet children.

21.    On September 21, 2010, Investor #1 received a telephone call from the person whose voice Investor #1 recognized as the person who had previously identified himself as "James Weston" and "Santo Crivera."  This time, the caller identified himself as "Andrew Black from UBS" and attempted to solicit Investor #1 to purchase stocks, including an initial public offering ("IPO") of General Motors stock.  Investor #1 recorded this conversation and thereafter contacted law enforcement authorities, who instructed Investor #1 to continue to record any future conversations with "Andrew Black."

22.    On September 27, 2010, the same caller, again posing as "Andrew Black from UBS," called Investor #1 and continued to solicit Investor #1 to purchase stocks. During this call, which was recorded by Investor #1 at the direction of law enforcement authorities, the person purporting to be "Andrew Black from UBS" stated that UBS had acquired Charles Schwab and provided an address where Investor #1 should send funds.

23.    In or about October 2010, law enforcement authorities contacted a representative of UBS, who stated that no person named "Andrew Black" had ever worked for UBS and that UBS

had not acquired Charles Schwab.   Further investigation revealed that the address where "Andrew Black" had instructed Investor #1 to send funds ("the UBS Address") was a commercial mailbox operated by Regus Management Group LLC ("Regus").   On its web site, Regus describes itself as a company which provides "Virtual Offices" including "mail and call handling services."  Records obtained from Regus reflect that, on October 25, 2010, JOHN GIARDINA opened a commercial mailbox with Regus on behalf of "UBS Clearing Corp." These records further reveal that GIARDINA opened this mailbox using a false New York Driver's license in the name "Quentin Reynolds" ("the False Driver's License").

24.   On or about November 10, 2010, law enforcement authorities contacted the true Quentin Reynolds, who stated that he had never opened a mailbox for UBS Clearing Corp and had not authorized anyone else to do so on his behalf.   The next day, Quentin Reynolds informed law enforcement authorities that he had received a phone call on that day from a check cashing service, City Check Cashing ("the Check Casher") to confirm whether he had recently attempted to cash checks with the Check Casher.   Further investigation revealed that GIARDINA, using the False Driver's License, had attempted to cash checks payable to UBS Clearing Corp at the Check Casher.   These checks were from two investors, Investor #2 and Investor #3.   Law enforcement authorities confiscated the proceeds of these checks from the Check Casher.

11

25.   Law enforcement authorities thereafter contacted Investor #2 and Investor #3, each of whom stated that they received a series of unsolicited telephone calls from a person identifying himself as "Andrew Black from UBS" beginning in approximately late October or early November 2010.  As with Investor #1, the person purporting to be "Andrew Black" solicited Investor #2 and Investor #3 to invest in an IPO of General Motors stock.  Based on the representations made by "Andrew Black," Investor #2 and Investor #3 each sent money to the UBS Address in the form of a check made payable to "UBS Clearing Corp."

26.  On or about November 10, 2010, law enforcement authorities directed Investor #1 to inform "Andrew Black" that Investor #1 was interested in investing with UBS Clearing Corp., and that Investor #1 was mailing a check to the UBS Address.  On November 15, 2010, Investor #1 informed "Andrew Black" that Investor #1 had mailed a check to the UBS Address.  In fact, as directed by law enforcement authorities, Investor #1 mailed an empty envelope to the UBS Address ("the Sham Envelope").

27.   On November 16, 2010, law enforcement authorities observed JOHN GIARDINA arrive at Regus and enter the commercial mailbox facility.  When GIARDINA exited the facility a few moments later, he was arrested.

28.  At the time of his arrest, GIARDINA was carrying the Sham Envelope sent by Investor #1, which GIARDINA had collected

12

from the Regus commercial mailbox.  On April 7, 2011, GIARDINA pled guilty to fraudulent use of an identification document as part of the scheme to defraud Investor #2 and Investor #3, in violation of 18 U.S.C. § 1028.

III. <u>Overview of the Grayson Hewitt Scheme</u>

29.   In July 2011, law enforcement authorities contacted Investor #2 to arrange final details for the return of the check which had been confiscated at the Check Casher.[4]   At that time, Investor #2 informed law enforcement authorities that in or about March 2011, Investor #2 had received a voice mail message from a person whose voice Investor #2 recognized as the same "Andrew Black" with whom Investor #2 had dealt in connection with Investor #2's investments with "UBS Clearing Corp."  This time, however, the caller identified himself as "Mark Anderson from Grayson Hewitt," stated that he had a new investment opportunity for Investor #2, and asked Investor #2 to call him on telephone number (347) 465-0606 ("the MARK ANDERSON TELEPHONE").

30.   Investor #2 provided law enforcement authorities with a copy of the recorded voicemail left by "Mark Anderson" as

---

[4]In or about December 2010, Postal Inspectors sent Investor #2 paperwork to complete in order to obtain the return of his portion of the funds confiscated from the Check Casher.  The Postal Inspection Service never received a response, and, in July 2011, Postal Inspectors contacted Investor #2 again, who stated that Investor #2 had never received the paperwork.  Postal Inspectors therefore re-sent the paperwork to Investor #2, who completed it and returned it to the Postal Inspection Service.

well as a recording of an earlier voicemail left by "Andrew Black."
Law enforcement authorities have compared this recording with the
voice of "Andrew Black" and "Santo Crivera" from the recordings
which agents directed Investor #1 to make. All three voices appear
to be the same person. Law enforcement authorities therefore began
an investigation into Grayson Hewitt.

31.   Records from the New York Department of State
reflect that "Grayson Hewitt Funding LLC" was founded in 2010. Bank
records from JP Morgan Chase ("the Chase Account") reflect that an
account was opened in the name of "Grayson Hewitt Funding LLC" on
May 24, 2010.  These bank records further reflect that the Chase
Account was opened in the name IRYNA YAROVA and that IRYNA YAROVA
used a Ukranian Passport and a DirecTV bill in the name IRYNA
YAROVA ("the DirecTV Bill") to open the Chase Account.

32.   Representatives of DirecTV have informed agents that
the account number listed on the DirecTV Bill does not correspond
with the name or address listed on the DirecTV Bill. It therefore
appears that IRYNA YAROVA opened the Chase Account using a false
document.

33.   Telephone records for the MARK ANDERSON TELEPHONE
reveal numerous calls to out-of-state numbers. In September 2011,
law enforcement authorities contacted two of these numbers,
corresponding to Investor #4 and Investor #5.  Investor #4 and
Investor #5 each stated that they had received telephone calls from

14

a person identifying himself as "Mark Anderson from Grayson Hewitt." Investor #5 stated that Investor #5 began receiving these calls in approximately February 2011, and Investor #4 stated that Investor #4 began receiving these calls in approximately May 2011.[5]

34. Investor #4 and Investor #5 each further informed law enforcement authorities that "Mark Anderson" stated that Grayson Hewitt purchases plaintiffs' rights to future recoveries in personal injury and other lawsuits and promised a fixed rate of return of 15 percent -- the same false claims made by representatives of the Rockford Group. Moreover, the person purporting to be "Mark Anderson" sent Investor #4 and Investor #5 sales brochures which claimed that Grayson Hewitt was located in New York, founded in 2006, and has provided over $100 million to more than 2,000 customers. As noted above, however, Grayson Hewitt was only founded in April 2010.

35. As a result of the misrepresentations made to them by "Mark Anderson," Investor #4 and Investor #5 each invested money with Grayson Hewitt. As with the UBS scheme, the address to which Investor #4 and Investor #5 sent their investment with Grayson

---

[5]Phone records reveal two short calls from the MARK ANDERSON TELEPHONE to Investor #5 in January 2011. Because each of these calls were less than one minute in duration, it is unclear whether Investor #5 ever spoke to the person using the MARK ANDERSON TELEPHONE during these calls. Phone records confirm that calls of longer duration between the MARK ANDERSON TELEPHONE and Investor #5 began in February 2011. These phone records also confirm that calls between the MARK ANDERSON TELEPHONE and Investor #4 began in May 2011.

Hewitt corresponds to a commercial mailbox ("the Grayson Hewitt Mailbox"). Records obtained from the company which owns the Grayson Hewitt Mailbox facility reveal that the Grayson Hewitt Mailbox was opened on April 6, 2010 by IRYNA YAROVA.

36. Investor #4 provided law enforcement agents with a copy of a sales brochure for Grayson Hewitt ("the Grayson Hewitt Sales Brochure") which Investor #4 had received in the mail from the person claiming to be "Mark Anderson." The Grayson Hewitt Sales Brochure refers to a web site, graysonhewittfundinggroup.com ("the Grayson Hewitt Web Site"). The Grayson Hewitt Sales Brochure and the Grayson Hewitt Web Site make claims similar to those made in the Rockford Sales Brochure and the Rockford Web Site, including a detailed description of Grayson Hewitt's purported business of funding lawsuit. The Grayson Hewitt Sales Brochure also referenced an 800 number, (800) 560-4405 ("the Grayson Hewitt 800 Number") for investors to call.

37. Investor #4 also informed law enforcement agents that "Mark Anderson" initially provided Investor #4 with the Grayson Hewitt 800 Number through which to contact "Mark Anderson." Thereafter, Investor #4 contacted "Mark Anderson" through the Grayson Hewitt 800 Number. At a later point, "Mark Anderson" provided Investor #4 with the MARK ANDERSON TELEPHONE as a contact number. Investor #5 also indicated that Investor #5 used the MARK

16

ANDERSON TELEPHONE to communicate with "Mark Anderson" but did not mention using the Grayson Hewitt 800 Number.

38. Much like in the Rockford scheme, the Grayson Hewitt 800 Number was maintained by Professional Answering Service ("the Answering Service"), a telephone service that provides an 800-number which can be routed to a user's telephone. The Answering Service also provides a "live answering" service in which employees of the Answering Service answer the 800-number and provide pre-arranged information to outside callers. This service is designed in part to create the impression that the Answering Service employees work exclusively for the company paying for the "live answering" service.

39. Records provided by the Answering Service indicate that an account for the 800 Number was opened by "Sam Freed" for "Grayson Hewitt Funding" on or about May 15, 2010. These records further indicate that the Answering Service employees were directed to forward callers asking for "Mark" to the MARK ANDERSON TELEPHONE, and to forward callers asking for "Lance," "Sam" or "Iryna Yarova" to SUBJECT TELEPHONE 1, among other numbers. As noted above, "Iryna Yarova" opened the Chase Account using a falsified DirecTV Bill.

40. The Answering Service provided a written record of messages transcribed between June 1, 2010 and December 28, 2011. Nearly all of these messages were for "Mark," "Sam" or "Lance" and

17

most appear to be from investors for Grayson Hewitt. Indeed, one such message was from Investor #4 on September 8, 2011 stating "please call re: her September statement". Other examples include a September 14, 2011 message for "Sam" stating "has account, calling to get some of the money sent back to him"; a May 25, 2011 message for "Sam Freed" stating "he is an investor, hasn't received his payment this month." These records also make clear that "Mark" and "Sam" are working together. For example, a September 7, 2011 message reads "about stock asked for Mark Anderson but Mark is out so will speak with Sam Freed."[6]

41. As with the Rockford scheme, records from the Chase Account reflect that investors with Grayson Hewitt often receive monthly dividend payments reflecting a relatively small portion of their investment. However, the Chase Account records reflect that Grayson Hewitt, like Rockford, has not invested funds as it promised its investors it would. Instead, a large portion of funds in the Chase Account has been used to purchase gold, meals, clothing and other consumer items.

IV.  The Undercover Phone Call

----

[6]Representatives of the Answering Service have informed law enforcement authorities that on or about September 26, 2011 the Grayson Hewitt 800 Number was deactivated, and Grayson Hewitt opened a new number (888)447-2010 ("the New 800 Number"). As with the original Grayson Hewitt 800 Number, the Answering Service employees were directed to forward callers to the New 800 Number asking for "Mark" to the MARK ANDERSON PHONE, and callers asking for "Sam," "Lance" or "Iryna Yarova" to SUBJECT TELEPHONE 1.

18

42. On September 12, 2011, Investor #5 agreed to tell "Mark Anderson" that Investor #5 had a "friend" who also wished to invest with Grayson Hewitt. Thereafter, an undercover agent ("the UC") called the MARK ANDERSON TELEPHONE and left a voicemail message posing as a potential investor. On September 13, 2011, "Mark Anderson" returned the phone call and discussed the undercover agent's potential investment with Grayson Hewitt. Phone records reveal that this call was placed from the MARK ANDERSON TELEPHONE.

43. At the beginning of this call, which was recorded by the UC, the UC informed "Mark Anderson" that the UC had been referred by Investor #5. "Mark Anderson then asked the UC "if you got a package [containing information concerning Grayson Hewitt], and you were interested, how quickly could you get that info back with a check?"

44. The UC responded that the UC was prepared to invest "within a week or so" and then asked for more information about Grayson Hewitt and the potential investment. "Mark Anderson" replied that "[w]e basically lend out against uh, lawsuits, that's our primary income, we make between 40 and 60 percent a year, uh, the only thing is this company is uh, we're not doing small ones these days, we're more like uh, like institutional size because we buy a box of cases from many small companies which were already placed, you know in the lien process and all of that so we buy them

in very big discounts so we're fortunate enough that you know, been doing this for quite a while now and we have cases constantly settling and like I said, you know, we're able to take investor funds and give them a good payout because there's, there's quite a big there for us, you know what I mean, there's, there's plenty of money there for everyone."

45. The UC then asked if the UC would be investing in "some kind of lawsuit?" to which "Mark Anderson" replied "...yes your funds are going to lawsuit victims, that is correct....and the only difference between ourselves and some of these, these other companies is you know, they fund all kinds of individual cases, we really don't do that, we, we go to companies that do that and we buy blocks of cases okay..."

46. As noted above, bank records reveal that Grayson Hewitt has not used investor funds to purchase the rights to lawsuits or blocks of lawsuits. Instead, as noted above, investor funds have been used to purchase gold, meals, clothing and other items.

47. The UC then discussed an initial investment of $1,000. "Mark Anderson" replied that "of course, I mean if you'd like to do something like that to test the waters, that's fine." The UC then asked "you said you're in business a long time, how, how long?" to which "Mark Anderson" replied "all together about seven years...and just so you know in this business, after you get

through your first year or two that's typically uh, you know when you, you gotta be worried in these businesses to be...you know like I said once you get over that hurdle of the first year or two uh, you're off to the races." It is my belief that "Mark Anderson" was trying to reassure the UC that it was safe to invest with Grayson Hewitt by falsely stating that it was a well-established business. Those who solicited the investors for the Rockford Group investments made similar false statements about the longevity of Rockford Group.

48. As noted above, records from the New York Department of State reflect that Grayson Hewitt was founded in 2010, while the Chase Account records reflect that the Chase Account was opened in May 2010.

49. The UC then asked where Grayson Hewitt was located, and "Mark Anderson" provided the Grayson Hewitt Mailbox address. The UC then asked whether that address was in the Wall Street area or downtown area, to which "Mark Anderson" replied "it's basically on the cu..., the cusp between Brooklyn and the city, it's on the cusp."

50. As noted above, there is no office building at the Grayson Hewitt Mailbox address, instead there is only a commercial mailbox facility. Moreover, the Grayson Hewitt Mailbox is located in an area of Brooklyn near Coney Island, and not close to Wall Street or downtown Manhattan.

51.   The UC concluded the call by requesting that "Mark Anderson" mail the UC a brochure, and "Mark Anderson" agreed to do so.

V.   Cooperation from Victim-Investors

52.   Investor #1, Investor #2, Investor #3, Investor #4 and Investor #5 each have no criminal records and the information they have provided concerning their respective investments is corroborated by bank records.  The information provided by Investor #1 concerning conversations with "Andrew Black" and "Santo Crivera" is corroborated by the recordings of these conversations made by Investor #1 at the direction of law enforcement authorities.  The information provided by Investor #2 concerning voicemails left by "Andrew Black" and "Mark Anderson" is corroborated by recordings of these voicemails which Investor #2 provided to law enforcement authorities.

53.   There are no recordings of conversations between "Mark Anderson" and Investor #4 or Investor #5 made at the direction of law enforcement authorities.[7]  Nonetheless, the information provided by these investors concerning the claims made by "Mark Anderson" are corroborated in several ways.  First, the statements which Investor #4 and Investor #5 attribute to "Mark Anderson" describing Grayson Hewitt's purported funding of lawsuits

_____

[7]Investor #3 is elderly and was not in a position to record phone calls or otherwise proactively cooperate in the investigation.

are consistent with the representations made in the Grayson Hewitt
Sales Brochure and Grayson Hewitt Web Site. Second, the statements
which Investor #4 and Investor #5 attribute to "Mark Anderson" are
consistent with "Mark Anderson's" statements to the UC, as set
forth above. Third, the Grayson Hewitt investment, as described by
Investor #4 and Investor #5, is strikingly similar to the Rockford
Funding scheme.

54.   None of the investors have been promised anything in
exchange for their cooperation with the investigation, nor have any
of the victims received preferential treatment from law enforcement
authorities.

55.   Despite the corroboration of background information
provided by all the investors discussed above, law enforcement
authorities have encountered serious difficulties in obtaining
cooperation from Investor #4 and Investor #5.

56.   As noted above, Investor #5 initially agreed to
assist law enforcement authorities by telling "Mark Anderson" that
"a friend" of Investor #5 would be calling him, when in fact, as
Investor #5 knew, this "friend" was an undercover law enforcement
agent. Shortly after Investor #5 agreed to assist in this manner,
law enforcement authorities instructed Investor #5 to refrain from
contacting "Mark Anderson" until further instructions from law
enforcement authorities, so that law enforcement authorities could
plan additional details for a false background story which both

23

Investor #5 and the UC could provide to "Mark Anderson" concerning their relationship.   When law enforcement authorities attempted to contact Investor #5 again the following day, however, Investor #5 did not return a law enforcement agent's calls and has never returned calls to agents since that time.   Moreover, it appears that Investor #5 did not follow agents' instructions, as phone records for the MARK ANDERSON TELEPHONE reflect numerous calls between Investor #5 and the MARK ANDERSON TELEPHONE since September 2011, including calls placed shortly after my instruction to Investor #5 to refrain from contacting "Mark Anderson."   As a result, law enforcement authorities were concerned that Investor #5 had compromised the integrity of the UC, and therefore the UC had no further contact with "Mark Anderson" after the September 13, 2011 telephone call described above.

57.   Moreover, law enforcement authorities later learned that, several days after law enforcement authorities first contacted Investor #4, Investor #4 contacted "Mark Anderson" to request a refund of Investor #4's investment with Grayson Hewitt. Investor #4 received a full refund of Investor #4's principal investment on or about October 6, 2011.

58.   Because I am concerned that, if additional investors are informed of the law enforcement investigation, they will inform "Mark Anderson" and other targets of the investigation in an attempt to obtain a refund of their investment, law

24

enforcement authorities have refrained from contacting any additional investors beyond Investor #5 and Investor #4. Instead, law enforcement authorities have identified additional investors through records provided by the Answering Service, phone records and Chase Account records.

VI.   The Identification of Peter Liounis

59.   On September 19, 2011, the Honorable Lois Bloom, United States Magistrate Judge, Eastern District of New York, signed an order, Misc. 11-694, ("the Mark Anderson GPS Order") authorizing disclosure of precise location data for the MARK ANDERSON TELEPHONE for a period of 30 days. On October 18, 2011, Judge Joan M. Azrack signed an order extending the Mark Anderson GPS Order for an additional thirty days. The service provider for the MARK ANDERSON TELEPHONE was unable to provide precise location data, and instead provided records reflecting the tower and antenna face ("cell site") used by the MARK ANDERSON TELEPHONE. These records reflect that the MARK ANDERSON TELEPHONE was located within a radius of approximately 0.5 miles of an area of Staten Island ("the MARK ANDERSON TELEPHONE AREA") during the time when nearly every call was made or received by the MARK ANDERSON TELEPHONE from September 19, 2011 through November 28, 2011.

60.   In or about September 28, 2011, law enforcement authorities conducting surveillance observed SANTO CRIVERA arrive at the residence of PETER LIOUNIS at 59 Genesee Avenue, Staten

25

Island, New York ("the LIOUNIS RESIDENCE").[8]  The LIOUNIS RESIDENCE

is located within the MARK ANDERSON TELEPHONE AREA.  On October 25,

2011, law enforcement authorities conducted an inspection of trash

("the LIOUNIS TRASH") which had been removed from outside the

LIOUNIS RESIDENCE by local trash collectors.[9]  An inspection of the

LIOUNIS TRASH revealed a handwritten note with three lines.   The

first line of the handwritten note contained the name of Investor

#6 (with a slight misspelling) and a number which telephone records

reveal corresponds to Investor #6.  Bank records for the Chase

Account indicate that Investor #6 invested with Grayson Hewitt.

The second line of the handwritten note contained the word "local"

and the number for SUBJECT TELEPHONE 1.  As noted above, records

from the Grayson Hewitt 800 Number Service reveal numerous contacts

between investors and SUBJECT TELEPHONE 1.   The third line

contained the word "Annelle" and the number "62.50-5k."   Bank

records from the Chase Account indicate that an investor with the

last name Anelle ("Investor #7") invested $5,000 with Grayson

---

[8]Law enforcement authorities had previously obtained a copy of
the passport and driver's license for SANTO CRIVERA, and the person
pictured in these documents matched the individual who law
enforcement authorities observed arrive at the LIOUNIS RESIDENCE on
September 28, 2011.

[9]Local trash collectors provided the LIOUNIS TRASH to law
enforcement authorities immediately after they had obtained it from
outside the LIOUNIS RESIDENCE and before mixing it with any other
trash.

Hewitt and received regular monthly dividend payments, frequently in amounts of $62.50.

61. Law enforcement authorities conducted surveillance of the LIOUNIS RESIDENCE on several days in September and October 2011. During this surveillance, law enforcement authorities learned that at least one other person appears to reside in the LIOUNIS RESIDENCE along with PETER LIOUNIS. Nonetheless, on two occasions, law enforcement authorities observed that PETER LIOUNIS was the only person present inside the LIOUNIS RESIDENCE when the MARK ANDERSON TELEPHONE was in use. As noted above, the MARK ANDERSON TELEPHONE remained within a 0.5 mile radius of the LIOUNIS RESIDENCE during this time period.

62. Moreover, records from the Answering Service indicate that, on July 21, 2011, the account holders provided special instructions to the Answering Service to inform callers that "Mark in Hong Kong on Business. Hold All Calls. He'll be bk in the ofc on 7/28 and return calls then." Treasury Enforcement Communications Systems records reveal that PETER LIOUNIS traveled from John F. Kennedy International Airport to the Dominican Republic on July 21, 2011 and returned on July 27, 2011.

63. Finally, on November 27, 2011, a Postal Inspector drove past the LIOUNIS RESIDENCE and observed PETER LIOUNIS standing outside the LIOUNIS RESIDENCE and speaking on a cellular telephone. LIOUNIS was standing on the sidewalk adjacent to the

27

street and next to a stop sign. A Postal Inspector recognized PETER LIOUNIS from a copy of LIOUNIS's United States Passport obtained from the United States State Department. While observing LIOUNIS, the Postal Inspector was able to hear his voice, which matched the voice of "Mark Anderson," "Santo Crivera" and "Andrew Black" on the recordings provided to the Postal Inspector by Investor #1 and Investor #2.

64. Based on the information set forth above, law enforcement authorities believe that PETER LIOUNIS is the person using the MARK ANDERSON TELEPHONE.

65. Moreover, all of the communications on the MARK ANDERSON TELEPHONE monitored pursuant to the Wiretap Order appear to be the same voice as the voice heard on the recorded calls discussed above. Therefore, it appears that PETER LIOIUNIS is the only person using the MARK ANDERSON TELEPHONE.

66. As noted above, SUBJECT TELEPHONE 2 is subscribed to PETER LIOUNIS at the LIOUNIS RESIDENCE.

## VII. Monitored Communications on the MARK ANDERSON TELEPHONE Between PETER LIOUNIS and Victim-Investors

67. Intercepted communications over the MARK ANDERSON TELEPHONE pursuant to the Wiretap Order included dozens of telephone calls between the MARK ANDERSON TELEPHONE and various victim-investors related to the Grayson Hewitt scheme described above, as well as a related scheme involving a purported initial

public offering of Grayson Hewitt stock. These schemes constitute mail fraud, wire fraud, money laundering and securities fraud. Indeed, every wire communication made on the MARK ANDERSON TELEPHONE which was monitored pursuant to the Wiretap Order concerned these topics. The following paragraphs summarize some of the communications and information gathered during the monitoring of the MARK ANDERSON TELEPHONE pursuant to the Wiretap Order.[10]

68.   On December 12, 2011, at approximately 4:03 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON TELEPHONE to call Investor #8. Records from the Chase Account reflect that Investor #8 has invested over $1 million with Grayson Hewitt since October 2011, in addition to other funds invested. During this call, ANDERSON solicited Investor #8 to invest additional funds with Grayson Hewitt for a new opportunity. Specifically, LIOUNIS told Investor #8, "now, I know you gonna say I'm crazy because I've come to you so many times and I really chuck it down your throat, you know what? You'll understand in less than three weeks why[,]" "we're talking about literally less than a month and this thing is done. . . . It's absolutely worth your while to take these warrants for less than a month. Absolutely

---

[10]None of the investors mentioned in this affidavit have been identified as subjects of this investigation, at this time. Based on this investigation, and what law enforcement authorities learned during the course of the Rockford investigation, it is my belief that the investors identified herein are victims of the fraudulent investment scheme described above.

29

100%." After Investor #8 indicated that he was unable to invest more funds at the time, LIOUNIS stated, "So you're saying there's no way in heck you could move something around and replace it for less than a month?" Investor #8 replied to LIOUNIS, "all my flexible cash, in capital is all used up now, so I'm max settled unfortunately." With respect to the money Investor #8 previously invested, LIOUNIS added, "like I said, between [January] first and fifteenth, you're gonna be very, very happy."

69. This call appears to be an attempt by LIOUNIS to solicit additional funds from Investor #8. Although the "new opportunity" to which LIOUNIS refers is unclear, it is likely either a new Grayson Hewitt contract or an investment in the Grayson Hewitt Initial Public Offering ("IPO") discussed in further calls set forth below. In either event, these inducements are likely fraudulent, as LIOUNIS and Grayson Hewitt have not invested funds in the manner promised to investors, but instead used investor funds to purchase food, clothing, gold and other items, and/or wired the funds overseas.

70. On December 12, 2011, at approximately 4:23 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the SUBJECT TELEPHONE to call Investor #9. Records from the Chase Account reflect that Investor #9 had invested over $9,000 with Grayson Hewitt since February 2011. During this call, LIOUNIS similarly solicited Investor #9 to invest additional funds. LIOUNIS

30

introduced himself to Investor #9, "I know you usually speak to Mr. Freed . . . I'm actually Mr. Freed's boss.  I'm the actually head fund manager here at Grayson & Hewitt."  LIOUNIS went on to say, "Tell me this, if there was an absolute, incredible opportunity that you couldn't pass on for . . . for nothing, would you be able to allocate funds if you had the right time?"  "I seen what you had invested . . . It would be a great opportunity to step up and maybe increase your position, knowing you gonna get seven months of interest, literally right out off the bat and the contract expires in five months. It's a great opportunity."  Based on this investigation and previous related investigations, I believe that LIOUNIS was offering to sell another investor's one-year investment contract with Grayson Hewitt to Investor #9, offering twelve months' of interest payments on what will turn out to be a five month investment.  Investor #9 declined to invest further funds.

71.  On December 15, 2011 at approximately 12:21 p.m., PETER LIOUNIS, posing as "Mark Anderson, used the MARK ANDERSON TELEPHONE to call Investor #10.  Records from the Chase Account reflect that Investor #10 has invested over $58,000 with Grayson Hewitt since February 2011.  During this call, LIOUNIS solicited Investor #10 to invest additional funds. LIOUNIS told Investor #10 "the day your wire hits that account, okay . . . exactly fifteen days later . . . as the head fund manager . . . I am going to release your [fixed dividend] contract . . . the funds you have in

31

house now . . . penalty free right back to you.  So you're gonna get a little over 30,000 dollars right back fifteen days later." LIOUNIS went on, "I promise you this . . . 15 days later . . . you get over 30,000 right back into your account . . . not a problem ... penalty free as the head fund manager . . . I could do that and that's what I'm gonna do for ya."  Investor #10 indicated he would consider the opportunity.

72.   This call appears to be an attempt by LIOUNIS to solicit additional funds from Investor #10 to invest in Grayson Hewitt.  This inducement is likely fraudulent, because, as noted above, LIOUNIS and Grayson Hewitt have not invested funds in the manner promised to investors, but instead used investor funds to purchase food, clothing, gold and other items, and/or wired the funds overseas

73.   On December 19, 2011, at approximately 6:07 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON TELEPHONE to call investor Investor #11.  Records from the Chase Account reflect that Investor #11 invested $20,000 with Grayson Hewitt since December 2010.  During this call, LIOUNIS solicited Investor #11 to invest additional funds with Grayson Hewitt in connection with an initial public offering of stock.  LIOUNIS did not disclose the name of this stock during the call.  Specifically, LIOUNIS told Investor #11, "I can give you, if you want, I can give you up to fifteen thousand shares.  If you want it..."  When

32

Investor #11 asked how much that would cost, LIOUNIS replied "it would be forty-five [thousand dollars] and you don't have to take it, Mr. [Investor #11]. Trust me!  I told ya, the rest [of the stock] is gone, I just wanted you to really take that, it'll help you make up some losses..." LIOUNIS further promised that Investor #11 would receive a $30,000 profit from this investment by January 15, 2012, noting "by the fifteenth, you're gonna be liquid...thirty k on top of what you're already making.  You're, you're pretty sweet.  That's a great holiday for ya!"  Investor #11 agreed to the investment.  LIOUNIS directed Investor #11 to wire the funds in the same manner as LIOUNIS had previously instructed Investor #11. LIOUNIS stated "I'm gonna pull these last fifteen thousand shares off the board and let me bury them into your account.  Just when you get a chance, as long as it's before the first or second [of January] please, just get that wire out."

74. Later on the call, LIOUNIS instructed Investor #11 to wire the funds to an entity called "Harleen Bank," rather than the Chase Account where Investor #11 had previously wired the funds.  LIOUNIS explained that the funds should go to "Harleen Bank" because "that's the people we're getting the shares from." Investor #11 indicated that he had the wiring instructions for "Harleen Bank" which LIOUNIS had previously provided to him. Towards the end of the call, Investor #11 stated, "I trust you implicitly.  All right."

33

75. This initial public offering scheme appears to be
fraudulent for several reasons. First, as discussed above, LIOUNIS
and Grayson Hewitt have not invested funds in the manner promised
to investors, but instead used investor funds to purchase food,
clothing, gold and other items, and/or wired the funds overseas.
Moreover, as noted above, LIOUNIS, while posing as "Santo Crivera,"
executed a similar fraudulent scheme involving a purported IPO of
General Motors stock. Given this history, it appears highly likely
that the IPO scheme discussed above is also fraudulent.

76. On December 19, 2011, at approximately 6:00 p.m.,
PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON
TELEPHONE to call Investor #13. In an earlier voicemail to the
MARK ANDERSON TELEPHONE on December 19, 2011 at approximately 5:00
p.m., Investor #13 had identified himself as the son of Investor
#12, an investor with Grayson Hewitt. Records from the Chase
Account reflect that Investor #12 invested approximately $38,000
with Grayson Hewitt since November 2010. During the December 19,
2011 call with LIOUNIS, Investor #13 indicated that his father had
suffered a heart attack and had been "showing some signs of some
dementia type of thing, to where he's getting overdrawn on his
accounts and got some get rich quick schemes going on, that I'm
trying to settle, settle out and get, get rid of..." LIOUNIS
responded that "right, right... oh, that's terrible... this

34

program was really good to him because it's a monthly income and it's... I'm sure he's told you, we're clockwork... our company is really strong and I'll give you the details also, as far as in case you did need money back for any reason, uh when, when the contract actually expires, you know, I'll, I'll have all those details for you tomorrow...."

77.   On December 21, 2011, at approximately 2:19 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON TELEPHONE to call Investor #13.   During this call, Investor #13 asked LIOUNIS for information about Grayson Hewitt.   LIOUNIS responded that "what we are, we're a funding company.   We, we lend money to lawsuit victims and we do structured settlements and we make about 30-40 percent a year we give our customers a good dividend pay out every month....[W]e're an institutional fund. You never heard of us because we're not on TV and commercials.   You know, we don't really deal, deal with what's called like uh, small plaintiffs.   We actually buy uh, you know, monstrous accounts. In other words, we're, we're a liquid company."   Later in the conversation, Investor #13 stated that his father's contract with Grayson Hewitt had already matured on November 15, 2011, and that, "I'm trying [sic] together the finances to be able to put him into an assisted living...and I have to have all the facts and figures and no offense but you guys are the hold up."   LIOUNIS responded, "well I'll put it to you this way if you need the funds back ..

35

that's not a problem... but uh... it's two steps here... let me get you on the account number, one, and then I'll put in a request uh, if you say the contract is gonna be over or it is over... compliance will let me know that as well... then I could simply put in a request for the funds that's not a problem....Unfortunately for all of us, right now, the holidays are right here...let's get through uh, Christmas...and uh, and then we could uh, we get right back to business here."

78.     LIOUNIS's   description   of   Grayson   Hewitt's investments is contrary to the Chase Account records and other evidence uncovered in the investigation.  As noted above, there is no evidence that Grayson Hewitt has used investor funds to purchase "structured settlements" as LIOUNIS described to Investor #13. Instead, as noted above, investor funds were wired overseas and/or used to purchase food, clothing, gold and other items.

79.  On December 29, 2011,, at approximately 12:25 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON TELEPHONE to call Investor #13.  During this call, LIOUNIS stated that he had reviewed Investor #12's account, and that Investor #12 had been "tapping into his principal" and periodically withdrawing principal from the account.  As a result, LIOUNIS stated there was only $3,000 remaining in the account.   In fact, records from the Chase Account do not reveal any such withdrawals.   Instead, the only payments from the Chase Account to Investor #12 since Investor

36

#12's initial investment in November 2010 were regular interest payments. LIOUNIS also indicated that Grayson Hewitt had sent Investor #12 a "get well fruit basket," which Investor #13 indicated they had received.

80. On December 29, 2011 at approximately 12:08 p.m., PETER LIOUNIS, posing as "Mark Anderson," used the MARK ANDERSON TELEPHONE to call Investor #11. During this call, LIOUNIS stated that the "IPO" would happen between "the first and the fifteenth" of January. LIOUNIS stated the IPO was a "very quiet, private deal" and that "Grayson Hewitt has a sister company that we file the dividends under and that's what it's going to go live under, but the symbol, what I'm being told, will be a Grayson Hewitt type symbol where it will match our company name." Investor #11 said "you told me it's going to go on the big board," to which LIOIUNIS stated "yes, that's for sure." LIOUNIS further stated that, because Investor #11 would be purchasing 15,000 shares from another Grayson Hewitt client, it was necessary for Investor #11 to purchase the shares in the IPO directly from this other Grayson Hewitt client, rather than from Grayson Hewitt itself. LIOUNIS further stated that payment was needed before January 3, 2012. LIOUNIS further stated "this is not something that will be happening in March or April, it's happening in January, right before your eyes." Later in the conversation, Investor #11 asked "will everything that we own be sold immediately?" to which LIOUNIS

37

responded, "everything, first tick...we don't have a choice in that...I'm going to do very well, I've got quite a few shares myself...you wait and see, during the month of January, you sit tight...I'm going to call you and say, hey, punch up these symbols right now, it's trading, you're out."

81.   As noted above, the IPO scheme appears to be a fraudulent scheme similar to the scheme involving a purported IPO of General Motors stock executed by LIOUNIS, while posing as "Santo Crivera."   While LIOUNIS's reference to the "big board" and "punch[ing] up these symbols" appears to be a promise that the stock will be publicly-traded on the New York Stock Exchange through a publicly-accessible stock symbol, in fact the investigation to date strongly suggests that there will be no IPO, but instead investor funds will be wired overseas, and/or used to purchase food, clothing, gold and other items.

82.   Records from the Answering Service show that some of the investors discussed above in calls monitored through the Wiretap Order have also attempted to contact FNU LNU also known as "Sam Freed," and that the messages were relayed to SUBJECT TELEPHONE 1. For example, on December 16, 2011, Investor #11 left a message with the Answering Service for "Sam" stating "please call wanting your cell number *called again*"; on December 19, 2011, Investor #13 left a message with the Answering Service for "Sam" stating "re father's trust, [Investor #13] Is taking over as a POA."

38

Records from the Answering Service reflect that both messages were conveyed from the Answering Service to SUBJECT TELEPHONE 1.  These records also reflect that instructions were provided to the Answering Service to inform callers that as of December 28, 2011 "Sam is out of the country on business" and to patch all calls to "Mark Anderson."

83.  On January 4, 2011, during a call between the MARK ANDERSON TELEPHONE and an investor, Investor #14, which was monitored pursuant to the Wiretap Order, PETER LIOUNIS, posing as "Mark Anderson" stated that "Sam gets back on Friday but he doesn't have to report back to work until Monday" and promised that "Sam" would call Investor #14 directly on Monday.

84.  There is therefore probable cause to believe that the REQUESTED INFORMATION will lead to evidence regarding the activities described above.  The REQUESTED INFORMATION is necessary to assist law enforcement agents in conducting surveillance, obtain additional evidence of the SUBJECT OFFENSES and to determine the identity of FNU LNU, also known as "Sam Freed."

### PRIOR AUTHORIZATIONS

85.  On October 27, 2011, United States Magistrate Judge Ramon E. Reyes signed three orders: (1) Misc 11-740, authorizing authorizing disclosure of precise location data for SUBJECT TELEPHONE 1 for a period of 30 days ("the Prior GPS Order"); (2) Misc 11-741 ("the SUBJECT TELEPHONE 1 Prior Pen Order"),

authorizing the use of a pen register and trap and trace device on SUBJECT TELEPHONE 1 for a period of 60 days; and (3) Misc 11-742, ("the SUBJECT TELEPHONE 2 Prior Pen Order") authorizing the use of a pen register and trap and trace device on SUBJECT TELEPHONE 2 for a period of 60 days.   On November 28, 2011, United States Magistrate Judge James Orenstein  authorized the non-disclosure of the Prior GPS Order for a period of 90 days.   On December 23, 2011, United States Magistrate Judge Robert M. Levy signed two orders, Misc. 11-741 and Misc. 11-742, extending the  SUBJECT TELEPHONE 1 Prior Pen Order and the SUBJECT TELEPHONE 2 Prior Pen Order, respectively, for a period of 60 days each.

## AUTHORIZATION REQUEST

86.   WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents to obtain the REQUESTED INFORMATION for a period of 30 days.

87.   IT IS FURTHER REQUESTED that the Court direct the Service Provider to assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the REQUESTED INFORMATION, and further direct the service provider to initiate a signal to determine the location of the SUBJECT TELEPHONES on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement officer

serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the SUBJECT TELEPHONES, for a period of 30 days. Reasonable expenses incurred pursuant to this activity will be processed for payment by HSI.

88.    IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONES outside of daytime hours.

89.    IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONES would seriously jeopardize the ongoing investigation, as such disclosure would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from and evade prosecution.   Moreover, to the extent that the warrant authorizes the seizure of any wire or

41

electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

90.   IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.   I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations, and not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums.   Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

91.   IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding AT&T not to notify any person (including the subscribers or customers of the account

42

listed in the attached warrant) of the existence of the attached

warrant until further order of the Court.

Dated:      Brooklyn, New York
            January 5, 2012

                                    _____
                                    Richard M. Delisio
                                    Special Agent
                                    Homeland Security Investigations


Sworn to before me the 5th day of January, 2012

_____
HON. JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property To Be Searched

1.    The cellular telephones assigned call number (917) 224-8087 ("SUBJECT TELEPHONE 1") whose wireless telephone service provider is AT&T, a company headquartered at Dallas, Texas;  and (917) 370-6944 ("SUBJECT TELEPHONE 2") whose wireless telephone service provider is AT&T, a company headquartered at Dallas, Texas.

2.    Information about the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 that is within the possession, custody, or control of AT&T including information about the location of the cellular telephone if it is subsequently assigned a different call number.

45

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government.  In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.  See 18 U.S.C. § 3103a(b)(2).

46

F.#2009R02161

MISC 12-009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x

IN RE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO OBTAIN
LOCATION DATA CONCERNING
MOBILE TELEPHONES ASSIGNED
NUMBERS (917) 224-8087 AND
(917) 370-6944

- - - - - - - - - - - - - - x

**TO BE FILED UNDER SEAL**

<u>ORDER</u>

Application having been made for a search warrant under
Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§
2703(c)(1)(A) for (1) information about the location of the
cellular telephone assigned call number (917) 224-8087,
subscribed to JOHN DOE, 555 WATER STREET, BROOKLYN, NEW YORK
11235 ("SUBJECT TELEPHONE 1") whose wireless telephone service
provider is AT&T ("the Service Provider"); and (2) information
about the location of the cellular telephone assigned call number
(917) 370-6944, subscribed to PETER LIOUNIS, 59 GENESEE AVENUE,
STATEN ISLAND, NY 10308 ("SUBJECT TELEPHONE 2") (together with
SUBJECT TELEPHONE 1, "the SUBJECT TELEPHONES") whose wireless
telephone service provider the Service Provider as further
described in Attachment B to the search warrant (the "REQUESTED
INFORMATION");

The Court finds that there is probable cause to believe that the REQUESTED INFORMATION will constitute or lead to evidence of violations of 18 U.S.C. §§ 1341, 1343 and 1956 as well as to the identification of individuals who are engaged in the commission of these offenses.  The Court also finds that there is reasonable cause to believe that providing immediate notification of the execution of the warrant may seriously jeopardize an ongoing investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates.  See 18 U.S.C. §§ 2705(b)(2), 2705(b)(3) and 2705(b)(5).  Furthermore, the execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510).  To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

IT IS HEREBY ORDERED pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) that law enforcement officers, beginning at any time within ten days of the date of this Order and for a period not to exceed 30 days, may obtain the REQUESTED INFORMATION concerning the SUBJECT TELEPHONES, with said authority to extend to any time of the day or night as required, including when the SUBJECT TELEPHONES leave

2

the Eastern District of New York; all of said authority being
expressly limited to ascertaining the physical location of the
SUBJECT TELEPHONES and expressly excluding the contents of any
communications conducted by the user(s) of the SUBJECT
TELEPHONES.

It is further ORDERED that AT&T (the "service
provider") assist law enforcement by providing all information,
facilities and technical assistance needed to ascertain the
REQUESTED INFORMATION, including by initiating a signal to
determine the location of the SUBJECT TELEPHONES on the service
provider's network or with such other reference points as may be
reasonably available and at such intervals and times as directed
by the law enforcement agent serving the proposed order, and
furnish the technical assistance necessary to accomplish the
acquisition unobtrusively and with a minimum of interference with
such services as the service provider accords the user(s) of the
SUBJECT TELEPHONES.

It is further ORDERED that the Department of Homeland
Security, Homeland Security Investigations compensate the service
provider for reasonable expenses incurred in complying with any
such request.

It is further ORDERED that the Court's Order and the
accompanying Affidavit submitted in support thereof be sealed
until further Order of the Court, except that copies of the

3

Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, and the service provider as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the issuing judicial officer within 14 days after the termination of the monitoring period authorized by the warrant.

It is further ORDERED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extension thereof.

It is further ORDERED under 18 U.S.C. § 2705(b) that AT&T shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the Court, except that AT&T may disclose the attached warrant to an attorney for AT&T for the purpose of receiving legal advice.

It is further ORDERED that this Order apply to any changed mobile telephone number subsequently assigned to the SUBJECT TELEPHONES within the period of this Order.

It is further ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

Dated:      Brooklyn, New York
            January 5, 2012

                                    _____
                                    THE HONORABLE JOAN M. AZRACK
                                    UNITED STATES MAGISTRATE JUDGE
                                    EASTERN DISTRICT OF NEW YORK

5

# United States District Court

_____ EASTERN _____ **DISTRICT OF** _____ NEW YORK _____

In the Matter of the Search of
**(Name, address or brief description of person or property to be searched)**

THE PREMISES KNOWN AND DESCRIBED AS:
A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(917) 224-8087, WITH SERVICE PROVIDED BY AT&T;

AND THE PREMISES KNOWN AND DESCRIBED AS
A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(917) 370-6944, WITH SERVICE PROVIDED BY AT&T

**SEARCH WARRANT**

**CASE NUMBER:**

MISC. 12-003

TO: Special Agent Richard M. DeLisio _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by **Special Agent Richard M. DeLisio** who has reason to
    Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

THE PREMISES KNOWN AND DESCRIBED AS A CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (917) 224-8087, WITH SERVICE PROVIDED BY AT&T; AND THE PREMISES KNOWN
AND DESCRIBED AS A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(917) 370-6944, WITH SERVICE PROVIDED BY AT&T, both as set forth in
Attachment A

in the EASTERN _____ District of NEW YORK _____ there is now concealed a certain

person or property, namely (describe the person or property)

Evidence, fruits and instrumentalities of violations of 18 U.S.C. 1341, 1343
and 1956 , as set forth in Attachment B.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the issuance
of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ 1/ / /12 _____
                                                                    Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime - 6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has
been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt
for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this
warrant to the Magistrate Judge on duty _____ as required by law.
                                  United States Judge or Magistrate Judge

_____ 1/5/12   4:40 pm _____ at _____ Brooklyn, NY _____
Date and Time Issued                           City and State

_____          _____
Name and Title of Judicial Officer                 Signature of Judicial Officer

## ATTACHMENT A

### Property To Be Searched

1.    The cellular telephones assigned call number (917) 224-8087 ("SUBJECT TELEPHONE 1") whose wireless telephone service provider is AT&T, a company headquartered at Dallas, Texas;  and (917) 370-6944 ("SUBJECT TELEPHONE 2") whose wireless telephone service provider is AT&T, a company headquartered at Dallas, Texas.

2.    Information about the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 that is within the possession, custody, or control of AT&T including information about the location of the cellular telephone if it is subsequently assigned a different call number.

45

**ATTACHMENT B**

Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government.  In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.  See 18 U.S.C. § 3103a(b)(2).

46